**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION**

| | | |
|---|---|---|
| CALLIE M. BRADEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:04cv0082 |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) | Judge Thomas A. Wiseman, Jr. |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

Before the Court is Plaintiff Callie M. Braden's motion for judgment on the administrative record (Doc. No. 14), filed along with a supporting brief (Doc. No. 15) seeking reversal of the Commissioner's decision denying benefits. The Commissioner of Social Security ("Commissioner" or "Defendant") filed a response opposing Plaintiff's motion (Doc. No. 18).

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's decision denying benefits is supported by substantial evidence. Accordingly, the Commissioner's decision denying benefits will be affirmed.

**I.      INTRODUCTION**

Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner's finding that Plaintiff was not disabled and denying her petition for disability insurance benefits ("DIB").

Plaintiff filed her current application for DIB on July 10, 2001, alleging that she had been disabled since April 1, 2001 due to fibromyalgia and depression. (Doc. No. 8, Attachment, Administrative Record ("AR") 30, 52–54.) Plaintiff's application was denied initially and upon reconsideration. (AR 30–33, 40–41.) Plaintiff requested and received a hearing. (AR 27, 42.) The hearing was conducted on November 24, 2003 before Administrative Law Judge ("ALJ") Peter C. Edison in Nashville, Tennessee. (See AR 381–411.) The ALJ issued a written decision denying Plaintiff's application on February 17, 2004. (AR 13–21.) The Appeals Council denied Plaintiff's request for review by letter dated July 8, 2004 (AR 7–9), thereby rendering the ALJ's decision the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.    FACTUAL BACKGROUND

Plaintiff was born December 6, 1950.  As of the date of the ALJ's decision, she was 53 years old. She received a twelfth-grade education and completed a home-study course in catering.  (AR 74.)  Her past relevant work includes work as a custodian and cook at a church, where she worked for fourteen years (see AR 385), cook at a school, custodian in a museum, caterer, and private housecleaner.  (AR 69, 79.)  The vocational expert ("VE") who testified at the hearing classified Plaintiff's past work as a cook as medium skilled work; her work as domestic house worker as medium semi-skilled work; and housekeeping as light unskilled work.  (AR 408.)

### A.    The Medical Evidence

Plaintiff alleges disability based on chronic pain associated with fibromyalgia, in conjunction with the residual effects of childhood meningitis, including hearing loss, vision loss and poor balance.  (AR 68.)  She also alleges depression and frequent severe headaches.

Her medical records indicate that she was involved in a car accident in October 1988 that resulted in neck pain that resolved with treatment.  (AR 227)  In 1992 and 1998 she was complaining of "gradually increasing" neck pain and discomfort, radiating into her arms with paresthesia.  (AR 226–27)  In May 1998, she suffered a lumbosacral sprain after moving tables at work.  This was largely resolved by June.  (AR 224–25.)

In February 2000, she presented to her treating physician (whose identity is not ascertainable from the record), for follow up of a sebaceous cyst.  At that appointment, she also complained of dizziness and staggering into walls, present for a long time but worse in the past few weeks.  She had not fallen and had "no true syncope but simply states that she often finds herself leaning onto a wall while walking."  She experienced dizziness when turning suddenly and occasionally upon standing up.  The physical exam was remarkable only for benign lateral nystagmus; Romberg test was negative.  (AR 299.)

Plaintiff was treated by Dr. Paul Perryman from at least as early as June 2001 through November 2001.  His records indicate that Plaintiff presented in June 12, 2001 with multiple complaints including pain in her back, legs and arms, headaches, poor concentration, memory loss, poor balance, ear pain, fatigue,

vision loss in one eye and other problems; she denied depression or any difficulty sleeping. She reported that she was "only working occasionally cleaning houses," but was not working much because of very low energy level. "She says her body doesn't feel like working." (AR 295.) She was diagnosed with tennis elbow and as possibly having fibromyalgia with multiple trigger points. Lab tests were ordered, which later revealed low B12 levels. (AR 296.)

At a follow-up exam for the B12 deficiency in September 2001, her chief complaint continued to be fatigue with "diffuse myalgias" and chronic weakness and paresthesias in her right upper extremity. She also complained of atypical headaches, "with a sensation that things are moving inside of her head" and remarked to Dr. Perryman that her symptoms closely matched those for fibromyalgia based on the literature he had previously given her. On physical exam, Dr. Perryman found diffuse muscular tenderness and multiple trigger points, and decreased right grip strength. He recommended exercise, gave her samples of Paxil, continued her on B12, and wanted to refer her to a neurologist, which she could not afford. (AR 285.) Lab work was negative (AR 286).

In October, Plaintiff left a phone message with Dr. Perryman, asking why she was not eligible for a disabled license plate. (AR 284.)

In November 2001, she complained to Dr. Perryman of worsening fibromyalgia, worsening anxiety and depression, left low back pain radiating to the right, worsening balance and frequent falling, inability to do things she used to do, and some vertigo-type symptoms. She also renewed her request for a handicap tag, which Dr. Perryman granted. Physical findings included lateral nystagmus with lateral gaze, tenderness on palpation of left and right sacroiliac joints and upper buttocks, Romberg test was abnormal/positive but she was able to walk slowly without falling. She again refused the referral to a neurologist because of the cost. Dr. Perryman gave her a trial sample of low-dose Maxide for vertigo. (AR 282.) She complained she did not tolerate Paxil, so he gave her some samples of Celexa. He felt the low back pain was likely a component of fibromyalgia. (AR 283.) This was her last exam with Dr. Perryman.

In July 2001, optometrist Dr. Stan M. Dickerson, Optometrist, opined that Plaintiff had corrected vision of 20/70 with normal ocular health except for nystagmus supposedly resulting from childhood meningitis, which did not allow for detailed visual work. Her condition was "stable." (AR 231.) In May 2003, Dr. Dickerson noted that the nystagmus made reading very difficult for Plaintiff. (AR 352.)

3

Also in July 2001, Dr. Darryl Rinehart performed a consultative examination at the Defendant's expense. In a letter dated July 26, 2001, he noted normal range of motion in all joints with no erythema, swelling or warmth to touch at any joints; the ability to bend over and touch toes; slow walking but with normal station and gait; cranial nerves intact; muscle strength "mildly diminished throughout but symmetrical." Dr. Rinehart closed by stating, "It is my feeling after seeing and examining her with respect to sitting, standing, lifting, walking, etc. I believe these are things certainly she should be able to do for 4 to 6 hours in an 8-hour workday." (AR 229.)

In a psychiatric evaluation performed August 12, 2001, Deborah E. Doineau, Ed.D., assessed Plaintiff has having "Dysthymic Disorder" and a "mild impairment in her ability to concentrate consistently." (AR 235, see also AR 236–49.)

In December 2001, Plaintiff began seeing Dr. Cummins Couch, III at Family Medicine Associates, P.C. as her primary care physician. At the initial visit on December 3, she reported a prior medical history of "[v]ertigo, anxiety, depression, fibromyalgia." She told Dr. Couch she was working part-time. He prescribed Prozac. A month later, on January 3, 2002, she reported "hurting all over x 3 - 4 months." Dr. Couch noted a history of fibromyalgia and acid reflux. He prescribed Prozac and maxide. (AR 315.)

At a follow up exam on February 8, 2002, Dr. Couch noted a "long [history] of fibromyalgia." Plaintiff's only complaint was intermittent pain all over her body. She claimed she had stopped taking Prozac because it made her jittery and nervous. Dr. Couch found diffuse but mild tenderness all over and added Wellbutrin to her list of prescriptions. (AR 315.)

In early March 2002 Plaintiff continued to complain she was "[v]ery tired, fatigued, just having a lot of trouble getting going, very stressed, anxious and nervous." She also complained of left hip and low back pain and was given stretching and strengthening exercises. (AR 314.) On March 25, 2002, at a follow-up examination, she reported "[s]till having aching kind of pain, . . . kind of all over though, sometimes in back and lower extrem[ities]." At that point she denied having any lightheadedness or dizziness but was "very fatigued and had trouble going to sleep." Physical findings were negative except for "[m]ild lumbosacral pain to palp." She was continued on Wellbutrin, started on Effexor instead of Celexa, and given samples of Vioxx. (AR 313.)

On April 22, 2002 she complained of persistent pain, fatigue, aching in her muscles and joints,

4

sometimes in the morning, sometimes in the evening.  She reported inability to work at times and noted that she had "filed for disability again."  (AR 313.)  Physical findings were negative except "myalgias to palpation."  She claimed to have experienced no improvement with Celexa, Effexor, Wellbutrin or Vioxx.  Dr. Couch tried her on Tylenol # 3, Mobic and Zoloft.  (AR 313.)

The record includes treatment notes for mental health counseling at the Centerstone Community Mental Health Centers from December 2001 through May 2002.  Generally, Plaintiff reported feeling sad and lonely and attributed her depression to her physical pain.  (AR 329.)  She reported having problems with low self-esteem, having difficulty saying "no" to people, putting others ahead of herself.  (AR 325–29.)

Plaintiff was treated by neurologist Edcheril Benny, M.D. upon referral from Dr. Couch from March through August 2002.  In a letter from Dr. Benny to Dr. Couch dated March 21, 2002, Dr. Benny noted that Plaintiff complained of a history of one year of frequent atypical headaches mainly in the left temporal frontal region.  She also noted problems with equilibrium and occasional dizziness and right-sided deafness but "no worsening of these symptoms."  (AR 342–44.)  After an MRI, Dr. Benny diagnosed her as having a mild Chiari I malformation but did not indicate whether he felt this malformation was symptomatic or related to her complaints.  (AR 339.)

In May 2002, Dr. Benny again noted a history of frequent headaches and fibromyalgia.  Plaintiff complained the headaches changed from one side to the other, and stated they frequently were more on the face and temporal region.  She reported her dizziness somewhat improved but continued pain in the muscles of arms and legs.  Dr. Benny prescribed Trileptal, an anti-epileptic medication that he felt would help her neuralgic symptoms involving the trigeminal nerve and possibly her fibromyalgia too.  (AR 341.)

In August 2002, Plaintiff reported no change in her symptoms, including frequent headaches, myofascial pain, and feeling "somewhat fatigued and somewhat depressed."  Dr. Benny noted the plan was to increase Trileptal, stop Zoloft, decrease Wellbutrin, and add Trazadone to help her sleep.  (AR 340.)

Plaintiff underwent surgery for hernia repair in September 2002 (AR 354) and again on November 26, 2003 (AR 380).

Dr. Quisling, an otolaryngologist, began treating Plaintiff in September 2003.  He noted that her external ear canals were filled with cerumen which was partially cleaned.  He noted significant hearing loss and recommended a hearing aid.  He also noted that Plaintiff's general appearance was normal, as was her

5

ability to communicate. (AR 376–77.)

In November 2003, Dr. Quisling described Plaintiff as a "52 year old female with intermittent hearing loss, tinnitis, and fullness." Plaintiff stated her symptoms had not improved since her last visit; this time, Dr. Quisling noted under "General appearance" that she appeared to be "in acute distress." He again noted profound hearing loss in her right hear, mild mixed hearing loss in left hear, unchanged compared to previous test. He noted his impression of Ménière's disease, "active, vestibular." He discussed this diagnosis "extensively" with Plaintiff and again advised her to consider a hearing aid and to follow a low-salt diet. (AR 378–79.) The record also contains a letter dated December 4, 2003 from Dr. Richard Quisling "To Whom It May Concern," stating "Ms. Braden has been diagnosed with a Ménière's Disease and has sensorineural hearing loss." (AR 359.)

### B.    Residual Functional Capacity Assessments

A Residual Functional Capacity Assessment performed on September 13, 2001 found Plaintiff capable of occasionally lifting 50 pounds and frequently lifting 25 pounds, standing or walking about 6 hours in an 8-hour workday, sitting about 6 hours in an 8-hour workday, with an unlimited ability to push and/or pull. In the commentary supporting these findings, the consulting physician noted that Plaintiff's alleged disabling conditions included fibromyalgia, trouble hearing and vision problems. He noted a history of conservative treatment of her symptoms, that all x-rays were negative and no neurological deficiencies had been found. He also noted she had full range of motion in her back and other joints with no swelling or inflammation. She walked slowly but with normal gait and station; she complained of fatigue but was found to have only mildly decreased strength. (AR251–52.) He therefore found her impairments to be severe but not disabling. Likewise, Dr. Lawrence Schull reached nearly identical conclusions in an RFC conducted March 25, 2002. (AR 305–12.)

In December 2003, Plaintiff's treating physician at that time, Yoga N. Thati, M.D., referred her to Baptist WorkSmart Center for a functional capacity evaluation. In that evaluation, dated December 9, 2003, Birgit Barnes, PT, noted that "client self limited her ability and demonstrated inconsistency in some of her tests" and that "Waddell's Test for symptom magnification was positive." Ms. Barnes further indicated that Plaintiff sat for 65 minutes during the test without difficulty; she walked around clinic without her cane with good balance; walked 5 and ½ minutes on the treadmill using the handrails for support; and she was on her

6

feet for 1 hour and 45 minutes during the exam, sitting down once before the last test but only for a couple of minutes. She was able to climb steps using one handrail for support; her range of motion was within functional limits although she complained of pain during movement in every joint. Strength was 3+/5 with indications of poor effort. Grip and pinch strength were far below normal, but Plaintiff's poor effort was "evidenced by positive grip tests and a lack of a bell shaped curve." (AR 362–68.) Ms. Barnes felt that the results of the functional capacity evaluation "do not demonstrate this client's maximum ability. They are only an indication of what this client was willing to demonstrate to this evaluator." (AR 362.)

### C.     Plaintiff's Hearing Testimony

At the Hearing conducted before the ALJ on November 23, 2003, Plaintiff complained of complete hearing loss in her right ear and intermittent hearing loss in her left ear. She claimed her hearing had worsened significantly, and that at times the hearing in her left ear went out completely, with the spells where she was unable to hear anything becoming more and more frequent. (AR 387–88.) She claimed a hearing aid would not help but also admitted she had never tried using one. (AR 407).

She had worked for fourteen years at a Methodist Church but was let go in 1998. She was vague as to why she had been let go, but attributed it to her failing health. (AR 389.)

She claimed to have a problem with balancing that had always been an issue but was getting worse with age. (AR 389.) She had been using a cane since one was prescribed by Dr. Kennedy in 2001, but claimed her new doctor, Dr. Thati, had recommended a walker because she kept tripping over her cane. (AR 391.)

Plaintiff claimed to have the ability to stand for a maximum of ten minutes before getting tired out, and to sit for about five minutes. She reported spending most of her time lying down. (AR 393)

Her primary complaint was of fatigue and lack of energy, as well as pain and numbness. She claimed that all medications for pain made her drowsy. (AR 397.) She did not have the energy both to get dressed and fix herself a meal, and it allegedly takes her thirty minutes to get dressed. (AR 398.) She no longer does any cooking for herself or cleaning, though relatives helped her some. (AR 399–400.) She was depressed because of her health condition and inability to do the things she used to. (AR 401.)

She reported that her physicians says she has TMJ "real bad" and sometimes her mouth will just close up and she "can't even open to say anything." She also reported frequent headaches. (AR 406.)

7

She still drives some around Columbia but would not feel comfortable driving in Nashville. (AR 403.)

### D. Vocational Testimony

At the hearing, Vocational Expert Dr. Sturgill testified. He described Plaintiff's past relevant work as a cook as medium and skilled; domestic houseworker, medium unskilled; cleaner or housekeeping, light unskilled.

The ALJ asked Dr. Sturgill, hypothetically, whether a claimant who has a residual functional capacity for a full range of light work that does not require a significant amount of oral communication could perform past relevant work as cleaner/housekeeper. The VE stated that she could. (AR 409.)

### III. THE ALJ'S FINDINGS

The ALJ reviewed Plaintiff's medical history and the various functional capacity evaluations. He found that Plaintiff had "severe" impairments including fibromyalgia and reduced vision, but that her impairments did not meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, and Appendix I. (AR 21.) With respect to the fibromyalgia, the ALJ noted that "[t]his is usually a diagnosis given in lieu of objective evidence to explain subjective complaints of generalized aches and pains." (AR 20.) He found that the neurological and musculoskeletal examinations were essentially normal, and did not ascribe much weight to the diagnosis of Ménière's Disease, which he felt had come "out of left field." (AR 20.) He noted that the most recent functional capacity evaluation attempted had been determined invalid as a result of poor effort on Plaintiff's part. Nonetheless, giving Plaintiff "the benefit of the doubt," he found her impairments would preclude medium work but that she had the ability to perform light work that did not require detailed visual work. (AR 20.) Because Plaintiff's past relevant work as a cleaner/housekeeper fell within that category, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.

In support of his conclusion, the ALJ stated he had considered Plaintiff's subjective complaints of pain. He noted that, while she claimed she basically stayed at home all the time, her activities of daily living as reported to her psychological examiner included doing housework such as laundry, dusting, and simple cooking. She also drove around town, sometimes picked up her grandchildren at daycare, went to church on Sunday, prepared and taught a Sunday school class, got together with a group on Mondays to visit a local hospital, paid her bills, and went shopping. She was also described as appropriately groomed and stated that she took care of her own hygiene. In addition, there were references in the record that she continued

8

to work part time after the alleged onset of disability. "Considering the evidence in its entirety," the ALJ "[did] not find the claimant's complaints to be persuasive to the extent alleged." (AR 20.)

## IV.   DISCUSSION

### A.   Standard Of Review

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. See Abbott v. Sullivan, 905 F.2d 918, 922 (6th Cir. 1990). If substantial evidence supports the ALJ's conclusion, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. Youghiogheny & Ohio Coal Co. v. Webb, 49 F.3d 244, 246 (6th Cir. 1995). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. See Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantiality is based upon the record taken as a whole. See Houston v. Sec'y of Health & Human Servs., 736 F.2d 365, 366 (6th Cir. 1984).

### B.   Evaluation Of Entitlement To Social Security Benefits

Title II of the Social Security Act (the "Act") provides for disability, survivors, and retirement insurance benefits. Under the Act, Plaintiff is entitled to receive benefits only if she is deemed "disabled." 42 U.S.C. § 423(d)(1)(A). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. See id. The Sixth Circuit has summarized the steps as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before

9

he can be found to be disabled.

3.   If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

See Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f).  The

claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has

the burden at step five to show that alternate jobs in the economy are available to the claimant, considering

her age, education, past work experience and residual functional capacity.  See Moon v. Sullivan, 923 F.2d

1175, 1181 (6th Cir. 1990).

C.      The ALJ's Finding Of No Disability At Step Four

Plaintiff objects to the ALJ's findings on several grounds, each of which is addressed below.

(1)      *Whether the ALJ Erred In Failing to Articulate the Weight Given to the Opinion of a Consultative Examiner or In Rejecting the Examiner's Opinion*

Dr. Darrel R. Rinehart, a consultative examiner hired at Defendant's expense, examined Plaintiff on

July 26, 2001.  As reported in his letter of that date, Dr. Rinehart noted Plaintiff's subjective complaints but

his objective findings were unremarkable.  He found that "with respect to sitting, standing, lifting, walking, etc.

I believe these are things certainly she should be able to do for 4 to 6 hours in an 8-hour workday."  (AR

228–29.)[1]

Plaintiff argues that it was error for the ALJ not to state with specificity whether he believed Dr.

Rinehart's findings were consistent with the other evidence of record nor to indicate how much weight he

accorded the opinion.  As Plaintiff correctly argues, if the Secretary rejects the opinion of a treating physician,

---

[1]The Court notes that this statement is ambiguous, as it might be interpreted to mean Plaintiff has the ability to sit for 4 to 6 hours in an 8-hour workday *and* to walk or stand for 4 to 6 hours in an 8-hour workday. Construing this statement in the light most favorable to Plaintiff, however, the Court construes the statement as indicating Dr. Rinehart believed that Plaintiff could sit, walk, or stand for a cumulative total of 4 to 6 hours in a day.

Case 1:04-cv-00082   Document 19   Filed 05/10/06   Page 10 of 13 PageID #: 10

he must articulate a reason for doing so. <u>Shelman v. Heckler</u>, 821 F.2d 316, 321 (6th Cir. 1987). "Presumably," Plaintiff continues, "the same would apply for a consulting physician that examined Plaintiff." (Doc. No. 15, at 5.)

Plaintiff's presumption notwithstanding, the law is clear that consultative examinations done on a one-time basis are not considered "substantial evidence," and the opinions offered by such a consultant are not afforded the same degree of weight as those of a treating physician. <u>See, e.g.</u>, <u>Hurst v. Schweiker</u>, 725 F.2d 53, 55 (6th Cir. 1984) (per curiam) (noting that greater weight is given to the opinions of treating physicians than to examiners hired by the social security administration), <u>cited in</u> <u>Edwards v. Sec'y of Health & Human Servs.</u>, 38 F.3d 1212, 1994 WL 560891, at *1 (6th Cir. Oct. 11, 1994) (unpublished opinion). Further, the undersigned is not aware of any authority requiring an ALJ to articulate clearly the weight given to a consulting examiner's opinion or his reasons for rejecting, in whole or in part, such an opinion.

Regardless, although the ALJ did not specifically indicate what weight he gave to Dr. Rinehart's findings, he did summarize those findings in his written opinion (<u>see</u> AR 18), and provided general reasons for not adopting the opinion in full: Although Plaintiff had a diagnosis of fibromyalgia, a severe impairment, she had no objective symptoms and the ALJ found Plaintiff not to be entirely credible with respect to the degree of pain and weakness reported. Moreover, the opinion of Dr. Rinehart was contradicted by two residual functional capacity assessments that took into account Plaintiff's subjective complaints of pain, and the ALJ's finding with respect to Plaintiff's credibility is supported by the Baptist WorkSmart assessment, which found Plaintiff to have engaged in symptom magnification and self-limiting behavior.

The Court finds that the ALJ was not required to give controlling weight to the opinion of a consulting examiner, and he did not err in failing specifically to state the weight given to such an opinion or to articulate specifically the reasons for rejecting the consultant's opinion. Under the facts of this case, it is sufficient that the ALJ summarized the assessment; articulated adequate reasons for not giving it controlling weight even though he did not specifically address those reasons to Dr. Rinehart's assessment; and pointed to evidence in the record that contradicted Dr. Rinehart's conclusions even though he did not specifically highlight these contradictions.

> **(2)** **Whether the ALJ's Residual Functional Capacity Finding Is Materially Different From the Hypothetical Question Posed to the Vocational Expert at the Administrative Hearing**

Plaintiff argues that the ALJ erred in formulating the hypothetical question posed to the VE. Specifically, Plaintiff claims that the ALJ found that Plaintiff was able to perform light work that did not require much oral communication *or* close visual work, but he did not ask the ALJ about whether Plaintiff's past relevant work as a housekeeper/cleaner required close visual work. Plaintiff does not offer any evidence, however, the housecleaning/cleaner work, either as performed by Plaintiff or as performed in the national economy, requires close visual work. More to the point, she had performed such work in the past, and there was no evidence in the record that her eyesight had changed substantially since the time she had performed such work. The ALJ did not err in failing to include this detail in his hypothetical to the VE.

### (3) Whether the ALJ Properly Evaluated Plaintiff's Ménière's Disease.

Finally, Plaintiff argues that the ALJ did not properly evaluate Plaintiff's Ménière's Disease. More specifically, Plaintiff claims that the ALJ erred in failing to characterize her Ménière's Disease as a "severe" impairment, and in failing to take the steps outlined in the regulations to contact Dr. Quisling, who diagnosed Plaintiff as having Ménière's Disease, to obtain additional information from him regarding this diagnosis.

It is apparent from Dr. Quisling's treatment notes, however, that the symptoms giving rise to the diagnosis of Ménière's Disease were long-standing issues that the ALJ took into consideration in assessing Plaintiff's ability to work, primarily her hearing loss (profound in her right ear and mild, mixed in her left), and presumably her dizziness/vertigo as well. Despite her hearing loss, Plaintiff's ability to hear and understand spoken words throughout the hearing and her ability to communicate without difficulty in a variety of settings supported the ALJ's findings that, at least as of the date of the hearing, Plaintiff's hearing loss was not a severe impairment. As the Defendant points out, the fact that Dr. Quisling's progress notes show that he advised Plaintiff on at least two occasions to try using a hearing aid further undermine Plaintiff's statements about the alleged severity of her hearing loss and how it restricted her activities. Moreover, Dr. Quisling's notes directly contradicted Plaintiff's statement at the hearing that she had been told a hearing aid would not help her.

With respect to her alleged dizziness and balancing problem, the ALJ reasonably relied upon Dr. Benny's more detailed findings and progress notes rather than upon Dr. Quisling's terse diagnosis of Ménière's Disease. Dr. Benny observed Plaintiff on several occasions and diagnosed neuralgia as the cause

of her pain symptoms.  He noted that Plaintiff had a longstanding problem with equilibrium and balance but the conditions were stable.  In addition, physical therapist Birgit Barnes, who performed the functional capacity evaluation on December 3, 2003, observed Plaintiff on her feet and walking around the clinic for over a hour without balance problems and without using the cane.  The ALJ's determination that Plaintiff's alleged lack of balance was not a severe impairment is therefore also supported by substantial evidence.

Dr. Quisling's diagnosis of Ménière's Disease essentially amounted to a new name for a combination of several conditions Plaintiff had been experiencing since well before she stopped working.  The ALJ did not err in failing to accord more weight to that diagnosis or in determining that Plaintiff's hearing and balance problems did not constitute severe impairments, alone or in combination with her other impairments.

V.     CONCLUSION

As set forth above, the Court finds that the ALJ's decision is supported by substantial evidence, and Plaintiff's objections to it are without merit.  The Commissioner's decision denying benefits will therefore be affirmed.  An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge

13